# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

Patricia LaFleur, et al.,
individually and as the
representatives of a class
of similarly situated persons,

Case No. 1:24-cv-1262

Plaintiffs,

JUDGE PAMELA A. BARKER

-vs-

Yardi Systems, Inc.,

MEMORANDUM OPINION & ORDER

Defendant.

Currently pending is the Motion to Dismiss of Defendant Yardi Systems, Inc. ("Defendant" or "Yardi"), filed on September 16, 2024 ("Defendant's Motion").  (Doc. No. 10.)  On October 16, 2024, Plaintiffs Patricia LaFleur and Michael Grose Sr. (individually, "LaFleur" and "Grose," together, "Plaintiffs") filed a Response to Defendant's Motion ("Plaintiff's Opposition").  (Doc. No. 13.)  On November 6, 2024, Yardi filed a Reply in Support of Defendant's Motion ("Defendant's Reply").  (Doc. No. 15.)  On January 22, 2025, Yardi filed a Notice of Supplemental Authority in Support of Defendant's Motion ("Defendant's Notice"), on January 27, 2025, Plaintiffs filed a Response to Defendant's Notice ("Plaintiffs' Response"), and on February 4, 2025, Yardi filed a Reply to Plaintiffs' Response.  (Doc. Nos. 16, 18 and 20.)

For the following reasons, Defendant's Motion is GRANTED.

## I.   Background

### A.  Plaintiffs' Allegations

In their Complaint, Plaintiffs set forth the following allegations.  In 2010, Yardi acquired a web-based platform known as PropertyShark, a property research website that offers reports for

commercial residential properties, including ownership details, property values, and sales history. (Doc. No. 1. at PageID # 5, ¶ 24.) Visitors to the PropertyShark website can "view detailed property reports, which include personal identifying information corresponding to the property, such as the property owner's full name, the owner's address, the property's purchase date and price, and its property tax information[,]" which enables users to accurately identify an individual. (*Id.* at PageID # 2, ¶ 4.)

Yardi gathers the information necessary to generate and present property reports by aggregating data "from over 400 different sources," both "public and proprietary" through a "dedicated data research team [that] makes sure the information it gathers is as accurate as it can be," and Yardi obtains this information without the knowledge or consent of the individuals identified in the property reports. (*Id.* at PageID #s 5-6, ¶¶ 25-27; *Id.* at PageID # 9, ¶ 39.)

### 1. Accessing PropertyShark Property Reports

A visitor to PropertyShark can access the ownership information contained in a property report in two ways. First, the visitor can search by property. Under this method, the visitor browses PropertyShark's already-compiled list of properties "through utilizing the 'Property Lists' tab," or searches for a property "by address, neighborhood, city, and/or zip code[.]" (*Id.* at PageID # 2, ¶ 5). Once the visitor has selected a specific property for which the visitor wishes to view the property report (and thus, the ownership information contained therein), PropertyShark prompts the visitor to "unlock" the property report "by signing up for a free account." (*Id.* at PageID # 6, ¶¶ 27-28.) After making the account, the visitor "can view one free report." (*Id.* at PageID # 7, ¶ 31.)

Alternatively, the visitor can search by owner. The visitor can "enter a person's name along with their 'City/County, State, Zip or Borough' to view that person's portfolio of current and

previously owned properties." (*Id.* at PageID # 2, ¶ 6; *Id.* at PageID # 6, ¶ 29.) By selecting an individual owner's name from the search results, the visitor can access the property reports associated with that owner. (*Id.* at PageID # 6, ¶ 29.) As with the first method, the visitor must "sign up for a free PropertyShark account" before the visitor can view a property report associated with that owner. (*Id.* at PageID # 7, ¶ 31.)

In summary, to access a property report—either for a given property or a property report associated with an individual owner—the visitor must first create a free PropertyShark account. (*Id.* at PageID # 2, ¶¶ 5-7; *Id.* at PageID # 7, ¶¶ 31-32.)

### 2. PropertyShark's Commercialization of Property Reports

Even after a visitor creates a free account, however, PropertyShark provides only one free property report. (*Id.* at PageID # 2, ¶ 7; *Id.* at PageID # 7, ¶¶ 33-34.) PropertyShark advertises to account-holding visitors the option to "either upgrade to a premium account or purchase individual [property] reports." (*Id.* at PageID # 7, ¶ 33.) For "$49.95 per month or $499.95 per year," PropertyShark markets to account-holding visitors a "'Pro' plan," which allows subscribers to access 175 property reports per month. (*Id.* at PageID # 8, ¶¶ 35-36.) Otherwise, an account-holding visitor can access one (1) report for $4.95 each. (*Id.* at PageID # 8, ¶ 36.)

"[T]he free account and [property] report" that Yardi provides to each account-holding visitor "serve[s] as a preview of the [PropertyShark] platform's features and the type of information available[.]" (*Id.*) That free account, according to Plaintiffs, is a "commercial strategy mainly aimed at enticing users to commit to a monthly or yearly subscription" and secondarily aimed at selling the individual property reports. (*Id.*) Plaintiffs allege that "the purpose of the free trial, along with access to the Plaintiffs' and Class Members' personas, is to advertise and entice prospective customers to

3

purchase either individual reports, or monthly or yearly subscriptions to PropertyShark." (*Id.* at PageID # 9, ¶ 37.)

Plaintiffs allege that "Plaintiffs' and the Class Members' Personas have intrinsic commercial value for the simple reason that they are used for advertising purposes and are a significant asset to the appeal of Yardi's PropertyShark platform. Yardi would not have misappropriated them for advertising purposes if they did not have intrinsic commercial value." (*Id.* at PageID # 9, ¶ 38.)

### 3. Patricia LaFleur and Michael Grose Sr.

In May 2024, Plaintiffs[1] "discovered that [their] persona[s] w[ere] accessible through PropertyShark" in that a piece of property LaFleur owns in Ohio and a piece of property Grose owns in Ohio are each listed in one of PropertyShark's property reports. (*Id.* at PageID # 9, ¶ 40; *Id.* at PageID # 11, ¶ 51.) Consequently, "potential customers" are "able to view [and] have viewed information on" LaFleur and Grose by using free PropertyShark accounts. (*Id.* at PageID # 9, ¶ 41; *Id.* at PageID # 11, ¶ 52.) Plaintiffs did not consent to let Yardi "use [their] persona[s] for its PropertyShark platform[,]" and Yardi "did not obtain prior written permission to use [their] name[s] and other identifying information to advertise paid subscriptions for PropertyShark or the purchase of other individual property reports on the platform." (*Id.* at PageID #10, ¶¶ 44-46; *Id.* at PageID # 12, ¶¶ 55-57.) They allege, upon information and belief, that "PropertyShark compiled [their] information from various sources of information, including public records" and that "Yardi did not obtain written permission from any sources from which it compiled [their] personal identifying

---

[1] The factual allegations in the Complaint for LaFleur and Grose are identical, (*compare* Doc. No. 1 at PageID #s 9-11, ¶¶ 40-50 with *id.* at PageID #s 11-13, ¶¶ 51-61), except that the Complaint contains a typo by referring to "Shephard" in Paragraph 49 where Plaintiffs apparently meant to refer to LaFleur. (*Id.* at PageID #11, ¶ 49.)

4

information for its PropertyShark platform." (*Id.* at PageID #10, ¶¶ 45, 46; *Id.* at PageID # 12, ¶¶ 56, 57.)

According to Plaintiffs, "[p]otential customers availing themselves of Yardi's PropertyShark platform are able to view and, on information and belief, have viewed information on [Plaintiffs] using their free account." (*Id.* at PageID #9, ¶ 41; *Id.* at PageID #11, ¶ 52.) Plaintiffs allege that by offering a free trial property report containing publicly available information, Yardi was using their personas to "market paid subscriptions." (*Id.* at PageID #s 9-10, ¶ 42; *Id.* at PageID #s 11-12, ¶ 52.)

Plaintiffs allege that the "intrinsic commercial value" of their "identit[ies] is demonstrated by [their] inclusion in the [PropertyShark] platform" because Yardi's business model "derives its value through the accumulation of individual identities[.]" (*Id.* at PageID #11, ¶ 48; *Id.* at PageID #s 12-13, ¶ 59.) Plaintiffs also allege that they have "intellectual property and privacy interests in [their] name, likeness, and identity[.]" (*Id.* at PageID # 11, ¶ 47; *Id.* at PageID # 12, ¶ 58.) In short, Plaintiffs allege that Yardi "injured [them] by using [their] name[s] and likeness[es] for its own commercial purposes without compensation or permission and [Yardi] has potentially subjected [them] to harassing and uninvited communications." (*Id.* at PageID #11, ¶ 50; *Id.* at PageID # 13, ¶ 61.)[2]

### B. Relevant Procedural History

On July 24, 2024, Plaintiffs filed a Class Action Complaint against Yardi. (*Id.*) Plaintiffs' Complaint sets forth two counts: (1) "Violation of ORPS,[3] Ohio Revised Code § 2741.01, et seq.,"

---

[2] Because the Court grants Defendant's Motion and dismisses the case, the Court need not delineate and address the allegations of Plaintiffs' Complaint related to class certification under Fed. R. Civ. P. 23. *See Curry v. SBC Communs., Inc.*, 250 F.R.D. 301, 308 (E.D. Mich. 2008) ("[C]lass certification would be inappropriate if the plaintiffs had failed to state a claim or produce facts sufficient to create a jury question, insofar as there would be no action to certify.").

[3] "ORPS" refers to the Ohio Right of Publicity Statute, Ohio Revised Code § 2741.01, et seq.

and (2) "Ohio Common Law Tort of Appropriation of Name or Likeness." (*Id.* at PageID #s 16-18, ¶¶ 71-81; *Id.* at PageID #s 18-19, ¶¶ 82-92). Plaintiffs ask this Court to "certify[] this case as a Class Action and appoint[] Plaintiffs and their attorneys as class representatives and class counsel, respectively[,]" and declare that "Yardi's actions . . . violate ORPS and Ohio common law[.]" Plaintiffs seek statutory damages and "actual damages and profits derived from the unauthorized use of Plaintiffs' and Class Members' names, likenesses and personas, plus prejudgment interest," an injunction prohibiting Yardi "from committing further misuse of Plaintiffs' personas and name[s] and likeness[es] for commercial gain[,]" and an award of attorneys' fees and costs and such other relief as this Court deems appropriate and just. (*Id.* at PageID # 20, ¶¶ A-F.) Also on July 24, 2024, Plaintiffs filed a "Placeholder" Motion for Class Certification to prevent Yardi from "picking off" the named Plaintiffs' claims by "tendering individual relief." (Doc. No. 2 at PageID # 25).

On September 16, 2024, Defendant's Motion was filed, on October 16, 2024, Plaintiffs' Opposition was filed, and on November 6, 2024, Defendant's Reply was filed. Then, on January 22, 2025, Defendant's Notice was filed, on January 27, 2025, Plaintiffs' Response was filed, and on February 4, 2025, Defendant's Reply was filed. (Doc. Nos. 10, 13, 15, 16 and 18.)

## II. Fed. R. Civ. P. 12(b)(6) Standard

Under Fed. R. Civ. P. 12(b)(6), the court may dismiss a claim where the claimant has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under this rule, the function of the court is to test the legal sufficiency of the complaint. *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). The court must construe the complaint in the light most favorable to plaintiffs, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.*

6

*v. Twombly*, 550 U.S. 544, 555, 12 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). However, legal conclusions and unwarranted factual inferences are not entitled to a presumption of truth. *Twombly*, 550 U.S. at 555; *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986) (the Court is "not bound to accept as true a legal conclusion couched as a factual allegation.").

Additionally, the Court must read Fed. R. Civ. P. 12(b)(6) in conjunction with Fed. R. Civ. P. 8(a)(2)'s requirement that a plaintiff need only offer "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555). Although specific facts are not required to meet the basic minimum notice pleading requirements of Fed. R. Civ. P. 8, a complaint must give the defendant fair notice of what the plaintiff's legal claims are and the factual grounds upon which they rest. *See Bassett v. Nat'l Collegiate Ath. Ass'n*, 528 F.3d 426, 437 (6th Cir. 2008). The plaintiffs' obligation to provide the grounds for relief "requires more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Thus, the plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Id.*

## III.     The Parties' Arguments

### A.  Initial Briefing

Yardi argues that Plaintiffs' Ohio law claims fail because Yardi's use of their names on PropertyShark is "incidental," that Plaintiffs' names lack "intrinsic commercial value,"[4] and that Yardi's use therefore falls under an exception to the statutory and common law causes of action Plaintiffs assert. (*Id.* at PageID # 83; *Id.* at PageID # 88 n.3) Yardi also argues that application of

---

[4] As noted below, Plaintiffs' Response to Defendant's Notice disputes that Yardi raised the "commercial value" argument. (Doc. No. 18 at PageID #s 179-80.)

Plaintiffs' more expansive interpretation of Ohio law would violate the First Amendment by imposing liability on Yardi for protected speech.  (*Id.*)  Yardi also contends that if this Court accepts Yardi's Ohio law arguments then the need for the Court to address Yardi's First Amendment defenses is obviated.  (*Id.*)

Plaintiffs make two core arguments in opposition to Defendant's Motion relevant to Ohio law. First, Plaintiffs argue that "the Complaint alleges the use of Plaintiffs' personas for commercial purposes without their prior consent" and that alleging such "commercial use of [Plaintiffs'] profiles" "is enough . . . to state a claim under both ORPS and common law."  (*Id.* at PageID #s 121-22.) Second, Plaintiffs dispute that Yardi's use of Plaintiffs' names in the property reports is "incidental" under Ohio law because it is "central to Yardi's marketing scheme."  (*Id.* at PageID # 117.) Specifically, Plaintiffs respond that the Complaint does not dispute the "propriety . . . of Yardi's creation of individual profiles" but rather "singularly focuses on [Yardi's] use of their identities . . . for advertising."  (*Id.*)

In Defendant's Reply, Yardi counters both of Plaintiffs' arguments.  First, Yardi affirmatively addresses Plaintiffs' response to its commercial value argument.  (*Id.* at PageID #s 145-46.)  Yardi labels as "circular reasoning" Plaintiffs' position that including Plaintiffs' names "in a free trial [property] report" sufficiently establishes that the names have "intrinsic commercial value." (*Id.* at PageID # 145.)  Second, regarding Yardi's incidental use defense, Yardi contends that even if PropertyShark uses Plaintiffs' names in the free property reports, that use is still "incidental" because Yardi does not imply that Plaintiffs "use, support, or promote" PropertyShark.  (*Id.* at PageID # 148) (quoting *Hudson v. Datanyze, LLC* (*Hudson I*), 702 F. Supp. 3d 628, 634 (N.D. Ohio 2023), *aff'd* (*Hudson II*), 2025 U.S. App. LEXIS 749 (6th Cir. Jan. 13, 2025)).

8

**B.  Defendant's Notice and Supplemental Briefing**

In Defendant's Notice, Yardi submits that in *Hudson II*, the Sixth Circuit affirmed the dismissal of right-of-publicity claims nearly identical to those involved herein brought under the ORPS and Ohio common law for the tort of appropriation of name or likeness, finding that the *Hudson* plaintiffs had failed to establish that their names had commercial value.  *See Hudson II*, 2025 U.S. App. LEXIS 749 at *2.  According to Yardi, *Hudson II* "forecloses Plaintiffs' claims against Yardi[,] because, "just as in *Hudson* [*II*], the Plaintiffs here allege nothing distinctive about their identities that give them commercial value apart from their 'intrinsic value' and inclusion in the PropertyShark database."  (Doc. No. 16 at PageID # 162.)  Yardi also argues that Plaintiffs "do not allege that Yardi posted their pictures on a billboard, for example, or did anything else with Plaintiffs' information other than treat it like the information of all the other individuals in the PropertyShark database."  (*Id.*)  Therefore, per Yardi, merely including someone's name in a database does not establish commercial value and therefore, Plaintiffs have failed to state a claim under Ohio's right-of-publicity law.

In Plaintiffs' Response, Plaintiffs set forth five (5) arguments as to why *Hudson II* does not support dismissal of their claims.  First, Plaintiffs argue that the Sixth Circuit's opinion is unpublished and therefore not binding.  (Doc. No. 18, PageID # 179.)  Second, while acknowledging that in *Hudson II* the Sixth Circuit agreed that the plaintiffs had failed to plead that their personas had "commercial value" under Ohio Rev. Code § 2471.01(A), Plaintiffs assert that Defendant's Motion *only* sought dismissal on "incidental use" but not on "commercial value" grounds, and that therefore, the Notice "raise[ed] new issues" that may not be considered now.  (*Id.* at PageID #s 179-80.)  Third, Plaintiffs argue that the *Hudson II* decision is "outweighed" by what they submit are persuasive

9

authorities, citing a decision from the Northern District of California, two decisions from the Western District of Washington, and a decision from the Southern District of Ohio. (*Id.* at PageID # 180.) Fourth, Plaintiffs argue that their Complaint contains additional allegations compared to those included in the complaint at issue in *Hudson I* and *II*. Fifth, Plaintiffs cite a Sixth Circuit interpretation of Kentucky law for the proposition that misappropriation as such is "sufficient evidence of commercial value." (*Id.* at PageID #s 180-81) (citing *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 624 (6th Cir. 2000)).

In Defendant's Reply, Yardi replies to each of Plaintiffs' five (5) arguments. First, Yardi acknowledges that *Hudson II* is not binding authority, but contends that it is "highly persuasive authority given the nearly identical legal and factual issues." (Doc. No. 20 at PageID # 194.) Second, Yardi disputes Plaintiffs' contention that Yardi did not argue that Plaintiffs' identities lacked "commercial value." Yardi cites to portions of Defendant's Motion where it argued that Plaintiffs' names lacked commercial value because their use was incidental,[5] and quotes from Defendant's Reply to wit: "Ohio's publicity law does not apply to the PropertyShark free trial property reports because Plaintiffs' names lack commercial value."[6] Third, Yardi asserts that Plaintiffs' "out-of-circuit authority doesn't address Ohio law" (as do *Hudson I* and *II*) and that *Wilson v. Ancestry.com LLC*, 653 F. Supp. 3d 441 (S.D. Ohio 2023) is factually inapposite. (*Id.* at PageID # 195.) Fourth, as to Plaintiffs' argument that in this case the allegations are different than those in *Hudson II*, Yardi replies that "the additional conclusory allegations boil down to a circular theory that their names have intrinsic value because Yardi included them in the PropertyShark database" but that theory was

---

[5] Yardi cites to Defendant's Motion (Doc. No. 10-1 at PageID #s 86-91.)

[6] Yardi cites to Defendant's Motion (*Id.* at PageID # 88.)

10

rejected in *Hudson I* and *II* (Doc. No. 20, PageID # 195.)  And, according to Yardi, the additional allegations do not distinguish this case from *Hudson II*, but "analogize[] it." (*Id.* at PageID # 196.) Fifth, Yardi argues that *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619 (6th Cir. 2000) "doesn't help Plaintiffs[,]" because "[t]he Sixth Circuit there *affirmed* the district court's rejection of the plaintiffs' Kentucky right-of-publicity claim because the mere alleged use of his identity was not 'itself sufficient evidence of commercial value.'" (*Id.* at PageID # 196) (citing *Landham*, 227 F.3d at 624).

## IV.     Law and Analysis

### A.  Ohio's Right of Publicity

The Ohio General Assembly created a statutory cause of action to protect each Ohioan's right of publicity: the Ohio Right of Publicity Statute, Ohio Rev. Code § 2741.01, et seq.  It provides in relevant part that "a person shall not use any aspect of an individual's persona for a commercial purpose[.]" Ohio Rev. Code § 2741.02.  A "persona" means "an individual's name, voice, signature, photograph, image, likeness, or distinctive appearance, if any of these aspects have commercial value." Ohio Rev. Code. § 2741.01(A).  An individual's "name" means "the actual, assumed, or clearly identifiable name of or reference to a living or deceased individual that identifies the individual." Ohio Rev. Code § 2741.01(C).

Ohio common law also recognizes the right of publicity as "one of four separate branches of tortious invasion of privacy." *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 468 (2007) (quoting *Sustin v. Fee*, 69 Ohio St. 2d 143, 145 n.4 (1982)).  The Supreme Court of Ohio has adopted the Restatement (Second) of Torts § 652C (Am. L. Inst. 1965) to define the parameters of that right, *see Zacchini v. Scripps-Howard Broad. Co.*, 47 Ohio St. 2d 224, 230 n.4 (1976), *rev'd on other grounds*, 433 U.S.

11

562 (1977); *see also James v. Bob Ross Buick, Inc.*, 2006-Ohio-2638, ¶ 13 (Ohio App. 2d Dist. 2006), so that under Ohio law, a defendant "who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy[.]"  Restatement (Second) of Torts § 652C; *Zacchini*, 47 Ohio St. 2d at 230 n.4.

While the "statutory cause of action did not supplant the common law claim," *Bob Ross Buick, Inc.*, 2006-Ohio-2638, ¶ 13 n.2, courts typically analyze claims brought under both the ORPS and the common law tort as "analogous claims" designed to vindicate the same right.  *Wilson v. Ancestry.com LLC*, 653 F. Supp. 3d 441, 454 (S.D. Ohio 2023);  *see also ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 954 (6th Cir. 2003) (explaining that while "Ohio recognizes the right of publicity as a part of the state's common law" the state "has recently codified that right.").  Thus, the Court proceeds by analyzing Plaintiffs' ORPS and common-law claims together.

Both the ORPS and common-law causes of action provide for exceptions where a plaintiff's name or likeness lacks "commercial value" and where the defendant's use of the name or likeness is merely "incidental."  *See Hudson II*, 2025 U.S. App. LEXIS 749 at *7 (holding that plaintiffs failed to state a claim for a violation of Ohio Rev. Code § 2741.02 and for invasion of privacy where they did not sufficiently allege that their names and likenesses had commercial value); *Balsley v. LFP, Inc.*, 2010 U.S. Dist. LEXIS 152034 at *25-28 (N.D. Ohio Jan. 26, 2010) (Oliver, J.) (granting summary judgment for the Defendant on both claims because the Defendant's use was merely incidental); *Roe v. Amazon.com*, 714 F. Appx. 565, 569 (6th Cir. 2017) (affirming summary judgment against both of Plaintiff's statutory and common law claims where "[a]t most, plaintiffs attempted to show that the association between the [plaintiff's] image and the Corporate Defendants is incidental, which is not enough.").

12

### B. Commercial Value

##### 1. Whether Plaintiffs' names have commercial value is not a "new issue" and therefore, the issue is properly before the Court.

As an initial matter, the Court addresses the second argument Plaintiff makes in its Response to Defendant's Notice. The Court rejects Plaintiffs' contention that in urging this Court to find that the Sixth Circuit's decision in *Hudson II* forecloses Plaintiffs' claims, Yardi has raised a "new issue." First, Plaintiffs' citation to *Schuler v. Vill. of Newcomerstown*, 2017 U.S. Dist. LEXIS 49454 (N.D. Ohio Mar. 31, 2017) (Lioi, J.) for the proposition that Yardi "may not 'raise new issues' now" is inapposite (Doc. No. 18 at PageID # 180) (quoting *Schuler*, 2017 U.S. Dist. LEXIS 49454 at *5 n.5). In *Schuler*, the Village of Newcomerstown had failed to move for judgment on the pleadings as to Schuler's intentional infliction of emotional distress ("IIED") claim, while it had moved for judgment on Schuler's other claims. *See id.* When Schuler pointed out Newcomerstown's omission in her Brief in Opposition, Newcomerstown raised a "new issue" in her Reply Brief by arguing that the IIED claim too "fails as a matter of law." *Id.* The *Schuler* court disregarded Newcomerstown's new argument because raising it for the first time in Newcomerstown's Reply Brief left Schuler without any opportunity to defend her IIED claim.

Unlike in *Schuler*, Yardi's "commercial value" argument is directed at the very same two claims Yardi had already moved to dismiss. Moreover, Yardi cited *Hudson I* three (3) times in Defendant's Motion (*see* Doc. No. 10-1 at PageID #s 83, 88, 89), Plaintiffs cited it twice (2) in Plaintiff's Opposition (*see* Doc. No. 13 at PageID #s 125-26), and Yardi cited it eight (8) times in Defendant's Reply (*see* Doc. No. 15 at PageID #s 144, 147, 148, 149, 151, 152, 153), all ***before*** Yardi raised *Hudson II*'s affirmation of *Hudson I* in its Notice. And, unlike in *Schuler*, Plaintiffs here had an opportunity to respond to what Plaintiffs claim is a "new issue" raised in Defendant's Notice

13

because the Court granted them leave to file a Response.  (Non-Doc. Entry of Jan. 24, 2025; Doc. No. 18.)

Second and more importantly, Plaintiffs are mistaken that Yardi failed to raise the "commercial value" argument in Defendant's Motion.  While referenced only in a footnote, Yardi did raise the argument:

> This is the same logic applied in *Vinci* where the inclusion of well-known Olympic athletes' image and information on Dixie Cups was incidental because 'there was no implication that the athletes used, supported, or promoted the product.'  591 N.E.2d at 729 [sic].  ***The same reasoning applies, even more forcefully, when comparing the public status of the Olympic athletes' personas to the barebones allegation of intrinsic commercial value of Plaintiffs' names here.***

(Doc. No. 10-1 at PageID # 7, n.3) (citing *Vinci*, 591 N.E. 2d at 794) (emphasis added).

Plaintiffs additionally expand on that argument in their Reply by setting forth a statutory analysis of "commercial value" in Ohio Rev. Code § 2741.01(A).  (Doc. No. 15 at PageID #s 145-146.)

Because Yardi and Plaintiffs cite to *Hudson I* multiple times in each of their filings, and because Yardi incorporates short but unmistakable arguments concerning the "commercial value" of Plaintiffs' names into Defendant's Motion and Defendant's Reply, the Court finds that Yardi did not improperly raise a "new issue" in its Notice and that the Court can properly consider the commercial value of Plaintiffs' names in light of Defendant's Notice and *Hudson II*.

### 2. Plaintiffs' names lack commercial value because they are not distinctive, recognized by the public, or notorious.

The ORPS forbids would-be defendants from appropriating an "aspect of an individual's persona for a commercial purpose," and it defines an individual's "persona" as "an individual's name . . . if [it has] commercial value."  Ohio Rev. Code. § 2741.01(A); Ohio Rev. Code § 2741.02.  Thus,

the "commercial value" of Plaintiffs' names is a factual predicate that they sufficiently plead to show that Yardi appropriated their "personas." *See id.*

To determine whether a name has commercial value, Ohio courts look to two critical factors: "(1) the distinctiveness of the identity; and (2) the degree of recognition of the person among those receiving the publicity." *Hudson II*, 2025 U.S. App. LEXIS 749 at *6 (quoting *Harvey v. Sys. Effect, LLC*, 2020-Ohio-1642, ¶ 61 (Ohio App. 2d Dist. 2020)) (cleaned up).  In other words, under Ohio law, "in order to succeed on [their] claim[s], Plaintiff[s] must have a notoriety which is strong enough to have commercial value within an identifiable group." *Harvey*, 2020-Ohio-1642, ¶ 61 (quoting *Cheatham v. Paisano Publications, Inc.*, 891 F. Supp. 381, 386 (W.D. Ky. 1995)).

But in Plaintiffs' Response, they contend that an underlying distinctiveness is not a separate requirement, arguing that the "commercial value" required under Ohio law can be inferred from a mere allegation of appropriation for a commercial purpose, i.e., from the mere commercial use of Plaintiffs' names for advertising.  (Doc. No. 18 at PageID # 180.)  To support their contention, Plaintiffs cite four district court decisions.  (*Id.*)  (citing *Kellman v. Spokeo, Inc.*, 599 F. Supp. 3d 877, 891-92 (N.D. Cal. 2022); *Wilson*, 653 F. Supp. at 455-56; *Kolebuck-Utz v. Whitepages Inc.*, 2021 WL 1575219 at *2 (W.D. Wash. Apr. 22, 2021); *Knapke v. PeopleConnect Inc.*, 553 F. Supp. 3d 865, 876 (W.D. Wash. 2021), *rev'd on other grounds*, 38 F.4th 824 (9th Cir. 2022)).

The district courts in *Kellman*, *Wilson*, *Kolebuck-Utz*, and *Knapke* agreed with Plaintiffs' reading of Ohio's commercial value requirement.  *See Kellman*, 599 F. Supp. at 891 ("because [defendant] uses [plaintiff's] persona for commercial gain—that is, to incentivize people to subscribe—it reasonably implies that his persona does have at least some commercial value."); *Kolebuck-Utz*, 2021 WL 1575219 at *2 ("Plaintiff provides sufficient facts to plausibly allege a

15

violation of Ohio's right of publicity law, based on the allegations of commercial use."); *Knapke*, 553 F. Supp. 3d at 876 ("[Plaintiff] has stated a claim under the Right of Publicity Law" because "[h]er persona is used to make the advertisement, which shows its commercial value."); *Wilson*, 653 F. Supp. 3d at 455 ("[Defendant's] practice of using [plaintiff's] persona to solicit paid subscriptions plausibly demonstrates that [plaintiff's] persona has commercial value.").

In Defendant's Reply to Plaintiffs' Response, Yardi attempts to distinguish those cases on the basis that "the out-of-circuit authority doesn't address Ohio law[.]" (Doc. No. 20 at # 195.) That is incorrect. While, contrary to Yardi's assertion, each case did apply Ohio law,[7] the principle of *stare decisis* does not require blind adherence to the reasoning of other district courts. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (quoting 18J James W. Moore et al., *Moore's Federal Practice* § 134.02[1][d] (3d ed. 2011)) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."). Both parties admit that the Sixth Circuit's unpublished opinion in *Hudson II* is not binding.[8] *See Watson v. Pearson*, 928 F.3d 507, 513 (6th Cir. 2019) (quoting *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007)) ("As an unpublished decision, [it] is not precedentially binding under the doctrine of *stare decisis*, but is considered by us for its persuasive value only.").

---

[7] *See, e.g.*, *Kellman*, 599 F. Supp. 3d at 891-92 ("[The defendant] argues that, for various reasons, the Ohio causes of action (brought by [the plaintiff] fail to state a claim."); *Knapke*, 553 F. Supp. 3d at 872 ("[The plaintiff], a resident of Ohio, seeks to represent a class of similarly-situated Ohio residents who have appeared in an advertisement preview on Classmates. She pursues a single claim under the Ohio Right of Publicity Law[.]") (citing Ohio Rev. Code. § 2741.02); *Wilson*, 653 F. Supp. 3d at 441 ("[The plaintiff's] position neither comports with R.C. § 2741 nor the case law interpreting Ohio's right of publicity."); *Kolebuck-Utz*, 2021 WL 1575219 at *1-2 (including a section titled "Claim Based Upon a Violation of Ohio's Right of Publicity Law").

[8] The parties agree that as an unpublished opinion, *Hudson II* is not binding authority, but persuasive authority. When in Plaintiffs' Response Plaintiffs asserted that *Hudson II* "is unpublished and therefore 'not binding authority,'" Yardi agreed that "*Hudson* [*II*] is highly persuasive authority[.]" (Doc. No. 18 at PageID # 179; Doc. No. 20 at PageID # 194.)

16

Accordingly, this Court must decide which interpretation of Ohio law is more persuasive: the out-of-circuit precedents' and *Wilson*'s interpretation that a name's commercial value can be inferred from a defendant's use of that name in an advertisement, or *Hudson II*'s contrary interpretation that Plaintiffs must plausibly allege a distinctiveness to their names to show commercial value.

For three key reasons, this Court finds more persuasive *Hudson II*'s acknowledgment that a name's commercial value is a separate requirement independent from its commercial use. First, the Court finds that Plaintiffs' proposed interpretation of Ohio law is fundamentally at odds with how Ohio courts have applied the commercial value requirement. Second, the Court agrees with Yardi's position that *Hudson II* is "highly persuasive given the nearly identical legal and factual issues." (Doc. No. 18 at PageID # 179.) Third, principles of statutory interpretation counsel against reading an allegation of use for a "commercial purpose" as itself evidence of the name's "commercial value" under Ohio Rev. Code. 2741.02(A) and Ohio Rev. Code 2741.01.[9] Thus, this Court predicts that *Hudson II*'s narrower interpretation of Ohio law more closely aligns with how the Supreme Court of Ohio would apply the commercial value requirement to these facts.

### i. *Hudson II* correctly interprets Ohio law to require a distinct underlying commercial value to Plaintiffs' names.

*Hudson II* applied *Zacchini*, *Harvey*, and *Roe* to interpret Ohio's commercial value requirement and reject Plaintiffs' same argument here, "that [Yardi's] misappropriation of their

---

[9] The Supreme Court has also signaled that decisions by the circuit courts are inherently more persuasive. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 232 (1991) (highlighting that the circuit courts, relative to district courts, "are structurally suited to the collaborative juridical process that promotes decisional accuracy. With the record having been constructed below and settled for purposes of the appeal, appellate judges are able to devote their primary attention to legal issues."); *see also* Bryan A. Garner, et al., *The Law of Judicial Precedent* 256-57 (2016) ("Because lower-court cases are usually decided expeditiously by one judge, a decision might not receive the same consideration and scrutiny as one issued by a high court.").

names or likenesses to solicit paid subscriptions, in and of itself, demonstrates commercial value." *Hudson II*, 2025 U.S. App. LEXIS 749 at *7-8.

*Zacchini*, the only opinion by the Supreme Court of Ohio cited by either party, illustrates how Ohio law requires an underlying distinctiveness to Plaintiffs' names. There, the Court "reasonably assumed" that the defendants had, by broadcasting Zacchini's distinctive "human cannonball" performance without Zacchini's permission, appropriated the "commercial value" of his right of publicity because "performers and other public figures wish to keep the benefits of their performances private, or at least to retain control over them, in much the same way that any individual would wish to keep control over his name and face." *Zacchini*, 47 Ohio St. 2d at 231. The Court did not base its conclusion that Zacchini's human-cannonball act had commercial value on the fact that it was publicly broadcast, but on its distinctive, notorious character. *See id.* at 239 (Celebrezze, J., concurring in part and dissenting in part) ("In his complaint, plaintiff alleges 'that he is engaged in the entertainment business and that the act which he performs is an act which was invented by his father and has been performed only by his family for the last fifty years.'").

Likewise, in *Harvey*, the court held that the plaintiff had "failed to present any evidence that her name had significant value, or indeed, ***any commercial value***. To the contrary, Harvey has repeatedly asserted that she was not a public figure or even a limited public figure, but merely 'sold a house to a private buyer in a private sale.'" 2020-Ohio-1642, ¶ 65 (emphasis added). The court specifically noted that "[t]he use of Harvey's full name is not of general interest and has no newsworthy value[.]" *See id.* Ohio law therefore demands an underlying "distinctiveness," "degree of recognition," or "notoriety" attached to Plaintiffs' names that Yardi took from them to use for itself. *Harvey*, 2020-Ohio-1642, ¶ 61.

18

In *Roe*, the plaintiffs brought claims under the ORPS and Ohio common law against Amazon, Barnes & Noble, and Smashwords, Inc. for using "a picture of the plaintiffs on a book cover without their permission."  714 Fed. Appx. at 566.[10]  The court emphasized that the "plaintiffs must demonstrate that their name or likeness has value," and concluded that "there is no summary judgment evidence in the record to suggest [that] there was any commercial value in associating their likeness with [the defendants]."  *Id.* at 569.  *Roe*'s holding suggests that Plaintiffs' theory of Ohio law is incorrect—were it correct, the court in *Roe* would not have stated that it needed *additional* evidence to show "commercial value" because the record had already established that the defendants had widely used the plaintiffs' image on the book cover.  *See id.* at 567 ("[The book] received media coverage in connection with Gronkowski's participation in the 2015 Super Bowl.  The cover of [the book], which included the plaintiffs' photograph, was displayed on *The Tonight Show*, *Jimmy Kimmel Live*, and at media day for the Super Bowl.  The attention given to the book by the national media appears to be how the plaintiffs became aware that their picture was used on the cover of [the book].").  In other words, additional evidence would only be necessary if being featured on national television was not enough, i.e., if the plaintiffs needed separate evidence to establish an underlying, distinctive commercial value to their names under Ohio law.

Finally, while it was not cited by *Hudson II*, *Hudson I* cited an unreported opinion by the Cuyahoga County Court of Common Pleas holding that "in order to state a cause of action for invasion of privacy by appropriation, the complaint must allege that plaintiff's name or likeness has some ***intrinsic value***, which was taken by defendant for its own benefit, commercial or otherwise."  *Powell*

---

[10] In *Roe*, the Sixth Circuit affirmed Judge Rose's opinion granting summary judgment to defendants Amazon.com, Barnes & Noble Inc., and Smashwords Inc.  *See Roe v. Amazon.com*, 170 F. Supp. 3d 1028 (S.D. Ohio 2016).

*v. Toledo Blade Co.* 1991 WL 321960 at \*4 (Ohio C.P. Cuyahoga Sept. 18, 1991) (quoting *Jackson v. Playboy Enterprises, Inc.*, 674 F. Supp. 10, 13 (S.D. Ohio 1983) (emphasis added); *see also Seifer v. PHE, Inc.*, 196 F. Supp. 2d 622, 630 (S.D. Ohio 2002) (quoting *Powell*); *Reeves v. Fox TV Network*, 983 F. Supp. 703, 710 (N.D. Ohio 1997) (citing *Powell* and concluding that "Plaintiff's name and likeness has no intrinsic value.  The Defendants did not include him in the 'COPS' show because of his name, personality or prestige.  The Barbour film crew was simply following a Cleveland Police officer and videotaped Plaintiff because he happened to be involved in a crime which was investigated by the police officer they were following.").  In summary, untethered from the limiting principle that a plaintiff's name must have an "intrinsic" commercial value, any reference to another's name in an advertisement would create liability.  Ohio law does not require this result.

Accordingly, the Court concludes that *Hudson II* correctly determined that Ohio law demands that Plaintiffs plead facts establishing an underlying, intrinsic commercial value to their names independent of the use of their names on PropertyShark.

### ii.  *Hudson II* is factually analogous to this case.

In *Hudson I* and *II*, Datanyze operated a digital database that allowed visitors to "search and obtain contact and information (both business and personal) of professional prospects."  *Hudson II*, 2025 U.S. App. LEXIS 749 at \*2.  Datanyze's online platform contained "120 million profiles, with 84 million email address and 63 million direct dial numbers" based on information gathered from LinkedIn, "the world's largest online professional network."  *Id.* at \*2.  Datanyze offered a "90-day free trial period, during which prospective customers receive 10 credits each month" and each credit allowed a user to "access a single profile on its platform."  *Id.*  Critically, once the free trial period elapses, Datanyze sells access to additional profiles from database.  *See id.* at \*2 ("After the trial ends

or a customer expends all the credits, the customer must obtain a paid subscription to view additional profiles.  A person cannot access Datanyze's database without a paid subscription or free trial."); *Hudson I*, 702 F. Supp. 3d at 630 ("Defendant's business model requires a user of the database to either buy a paid subscription or first sign up for a 90-day free trial.  The paid subscription plans cost $21 to $55 per month.").  The *Hudson II* plaintiffs filed claims under the ORPS and for the common-law tort of invasion of privacy under Ohio law.  *See id.*

The complaint at issue in *Hudson I and Hudson II* and Plaintiffs' Complaint include the following nearly identical allegations:

> Datanyze uses the 90-day free trial, along with the limited access to employee profiles as found through their names, to advertise and convince prospective customers to purchase its monthly subscription services, whereby those customers can access and retrieve employee profiles on any individual in Datanyze's database.  In other words, the free trial together with the limited free profile access is part of Datanyze's overall effort to sell its monthly subscriptions.

(Complaint, *Hudson I*, No. 3:23-cv-466-JRK, Doc. No. 1 at PageID# 7.)

> The purpose of [Yardi's] free trial, along with access to the Plaintiffs' and Class Members' personas, is to advertise and entice prospective customers to purchase either individual reports, or monthly or yearly subscriptions to PropertyShark.  The free trial, together with access to Plaintiffs' and the Class Members' personas, is central to Yardi's advertising scheme and is part of Yardi's effort to sell PropertyShark subscriptions.

(Doc. No. 1 at PageID # 9, ¶ 37.)

And, in *Hudson II* the Sixth Circuit concluded that "[n]o allegations in the complaint permit a reasonable inference that Plaintiffs' names and likenesses had commercial value before or after their appropriation."  *Hudson II*, 2025 U.S. App. 749 at *9.  In other words, in *Hudson II*, the Sixth Circuit interpreted Ohio law to find that the use of plaintiffs' names in a free trial used to draw customers to subscribe to its web-based platform was insufficient to establish that the names have

21

commercial value. Both Detanyze (through its free credits system) and Yardi (through its one free property report system) give away free access to a plaintiff's information as an advertisement to entice visitors to enroll in their subscription platforms. (*Id.* at PageID # 7, ¶ 33.)

*Hudson II* underscores precisely what was missing from the allegations of the complaint at issue therein and from the allegations of Plaintiffs' Complaint at issue herein: "The complaint mentions nothing about the distinctiveness of Plaintiffs' identities. Nor does the complaint explain how Plaintiffs received more recognition than others receiving publicity. Additionally, Plaintiffs do not allege that their names and likenesses were particularly valuable or recognizable to [the defendant's] targeted customers—business recruiters, salespersons, and marketers." 2025 U.S. App. LEXIS 749 at *7.

The nature of the information on Datanyze's website and PropertyShark are analogous as well. Just as Datanyze allows visitors to its web-based platform to access the *Hudson II* plaintiffs' names and contact information, including their email address and phone numbers, Yardi allows visitors to PropertyShark to access Plaintiff's names and a history of their ownership of real estate. (Doc. No. 1 at PageID # 2, ¶ 6; *Id.* at PageID # 6, ¶ 29.) Both Detanyze and Yardi obtain the information from publicly available sources: Detanyze obtains its contact information from LinkedIn, while Yardi obtains its information from public property records. (*Id.* at PageID #10, ¶¶ 45; *Id.* at PageID # 12, ¶¶ 56) ("PropertyShark compiled [their] information from various sources of information, including public records.")

Plaintiffs attempt to avoid *Hudson II* by abandoning their original allegation that the commercial value of their name is supported by their allegation of "'intellectual property and privacy interests' in their personas." (Doc. No. 18 at PageID # 180; Doc. No. 1 at PageID # 11, ¶ 47; *Id.* at

PageID # 12, ¶ 58.) Instead, they reiterate their argument that the very use of Plaintiffs' names for advertising demonstrates their names' commercial value.  (Doc. No. 18 at PageID # 180.)  But Plaintiffs' argument is contrary to *Hudson II*'s interpretation of Ohio law as requiring an underlying distinctive value to Plaintiffs' names *separate* from the allegation of appropriation itself.  According to the Sixth Circuit's decision in *Hudson II*, and as Plaintiffs concede, an allegation of only "intellectual property and privacy interests" is insufficient to state a claim under Ohio law; but so too is an additional allegation that fails to demonstrate a name's distinctive value outside the context of its use in the defendant's advertisement.  2025 U.S. App. LEXIS 749 at *7 (citing *Harvey*, 2020-Ohio-1642, ¶ 65).

Conversely, Plaintiffs' supposedly "additional" allegations here do not help them.  Instead, they cut *against* the distinctiveness of their names even more than in *Hudson II*.  (Doc. No. 18 at PageID # 180.)  Plaintiffs allege that "Yardi derives its value through the accumulation of individual identities[.]"  (Doc. No. 1 at PageID # 11, ¶ 48; *Id.* at PageID # 13, ¶ 59.)  Combined with their allegation that "the intrinsic commercial value of [their] identit[ies] is demonstrated by [their] inclusion in the [PropertyShark] platform," (*Id.* at PageID # 11, ¶ 48; *Id.* at PageID #s 12-13, ¶ 59), Plaintiffs have inadvertently pled that the commercial value of their names hinges on the accumulation of their names with others on PropertyShark.  Yet as set forth above, Ohio case law teaches the precise opposite—it is the distinctiveness and degree of recognition of that person's name that must supply the commercial value.  By tying the commercial value of their names to the "accumulation" of their names with other names on PropertyShark, Plaintiffs undercut the very distinctiveness required to state their claims.  By conceding that, alone, their names lack "a notoriety which is strong enough to have commercial value within an identifiable group," *Harvey*, 2020-Ohio-

23

1642, ¶ 61, Plaintiffs have therefore effectively pled "themselves out of court." *Reguli v. Russ*, 109 F.4th 874, 879 (6th Cir. 2024).

### iii. Principles of statutory interpretation require interpreting commercial value as a separate requirement.

Defendant's Reply points out that Plaintiffs' interpretation of commercial value would "make surplusage of the statute's requirement that a name must 'have commercial value' to be a "persona." (Doc. No. 15 at PageID # 146.)  The ORPS forbids using "any aspect of an individual's persona for a commercial purpose" and defines "persona" to mean a "name, voice, signature, photograph, image, likeness, or distinctive appearance, *if any of these aspects have commercial value*."  Ohio Rev. Code. § 2741.02 (emphasis added).  Inferring "commercial value" directly from Yardi's usage of Plaintiffs' names in furtherance of a "commercial purpose" reads the separate commercial value requirement out of the statute.  Ordinary principles of statutory interpretation therefore bolster *Hudson II*'s more limited reading of the ORPS and counsel against adopting Plaintiffs' distorted reading of the General Assembly's duly enacted legislation.  *See, e.g., State v. Reed*, 2020-Ohio-4255, ¶ 15 ("We are obligated to give effect to every word in a statute and avoid a construction that would render any provision superfluous."); *Allen v. United States*, 83 F.4th 564, 573 (6th Cir. 2023) (quoting *Nielsen v. Preap*, 586 U.S. 392, 414 (2019)) (the canon against surplusage "provides that 'every word and every provision of a statute is to be given effect and that none should needlessly be given an interpretation that causes it  to have no consequence.'").

Accordingly, the Court finds that the Supreme Court of Ohio would conclude that Plaintiffs have failed to sufficiently allege that their names have a commercial value under the ORPS and Ohio common law.

### 3.  Application of *Landham v. Galoob Toys, Inc.*

24

Because the Court has addressed Plaintiffs' Response's first, second, third, and fourth arguments sections above, the Court takes this opportunity to briefly address Plaintiffs' fifth argument regarding the application of the Sixth Circuit opinion in *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619 (6th Cir. 2000).

While this Court is certainly bound by on-point published opinions of the Sixth Circuit applying Ohio law,[11] *Landham* is easily distinguishable on two grounds, and therefore not "sufficient to allow Plaintiffs in this case to survive a motion to dismiss." (Doc. No. 18 at PageID # 181.)

First, Plaintiffs quote *Landham* for the proposition that "[t]he defendant's act of misappropriating the plaintiff's identity, however, may be sufficient evidence of commercial value." (Doc. No. 18 at PageID # 181) (quoting *Landham*, 277 F.3d at 624). Yet, as the Defendants correctly point out, the Sixth Circuit held that plaintiff in *Landham failed* to establish the commercial value of his name. (Doc. No. 20 at PageID 196) (citing *Landham*, 227 F.3d at 624). The Sixth Circuit affirmed the district court's judgment that the defendant did not violate plaintiff's right of publicity when the defendant sold an action-figure based on a character that the plaintiff played in the movie Predator. *Landham*, 227 F.3d 624 at 624. The Court reasoned that the plaintiff gained his "personal notoriety" "exclusively through playing that role." *Id.* at 625.

Second, Plaintiffs admit that the Sixth Circuit was applying Kentucky law in *Landham* when it commented that misappropriation may be evidence of commercial value, and the court supported

---

[11] *See Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)) ("Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.").

that proposition by citing to *McFarland v. Miller*, 14 F.3d 912 (3d Cir. 1994), a case from the Third Circuit applying New Jersey law.

Thus, to the extent this Court considers *Landham* persuasive, the Court agrees with Yardi that it weakens Plaintiffs' commercial value argument because it connects the commercial value of the plaintiff's name to a "personal notoriety" which, as explained above, Plaintiffs here have failed to allege.

### C. Incidental Use

Ohio precedent establishes that a merely incidental use of a plaintiff's name is insufficient to state a claim under ORPS or Ohio common law. *See Zacchini*, 47 Ohio St. 2d at 230 n.4 (adopting the incidental use exception as set forth in the Restatement (Second) of Torts § 652C).[12] Plaintiffs and Yardi therefore dispute whether using Plaintiffs' names in Yardi's free property reports, as advertisements, count as "incidental" under Ohio law. (Doc. No. 10-1 at PageID # 86-92; Doc. No. 13 at PageID #s 126-129.) As set forth below, this Court holds that Yardi's use of Plaintiffs' names is incidental for two reasons: (1) Plaintiffs rely only on inapplicable federal cases to determine Ohio's incidental use doctrine, and (2) PropertyShark advertises Plaintiffs' names only in the context of accurate, historical information without implying that Plaintiffs use, support, or endorse PropertyShark. *See Vinci*, 591 N.E.2d at 794.

---

[12] *Zacchini*, 47 Ohio St. 2d at 230 n.4. ("*Incidental use of name or likeness*. The value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities; nor is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity. No one has the right to object merely because his name, or his appearance, is brought before the public, since neither is in any way a private matter, and both are open to public observation. It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded.").

26

First, Plaintiffs' proffered interpretation of Ohio law falls short because it relies on the out-of-circuit opinions in *Kellman*, *Kolebuck-Utz*, and *Knapke*, and to *Wilson*'s application thereof. However, Judge Knepp's well-reasoned opinion in *Hudson I* adequately demonstrates that *Kellman*,[13] *Kolebuck-Utz*,[14] and *Knapke*[15] "never considered incidental use" under Ohio law. *See Hudson I*, 702 F. Supp. 3d at 632-33. This Court's role sitting in diversity is to apply Ohio law by predicting how the Supreme Court of Ohio would rule were it to address this precise question. *See Hudson I*, 702 F. Supp. 3d at 634 (quoting *Managed Health Care Assocs., Inc. v. Kethan*, 209 F.3d 923, 927 (6th Cir. 2000)). When the Supreme Court of Ohio has not addressed an issue, "the court must make an *Erie* judgment as to how Ohio's courts would decide the issue." *Kings Dodge, Inc. v. Chrysler Grp., LLC*, 595 F. Appx. 530, 534 (6th Cir. 2014) (emphasis added). In the "*Erie* guess" context this case presents, opinions by Ohio's own intermediate appellate courts therefore take on a paramount importance. *See Fid. Union Tr. Co. v. Field*, 311 U.S. 169, 177-78 (1940) ("An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question."). Because *Wilson*'s incidental use analysis applies *Kellman*,

---

[13] *Kellman* based its incidental use analysis on California's incidental use doctrine, not Ohio's. *See Kellman*, 599 F. Supp. 3d at 891 (quoting *Davis v. Elec. Arts Inc.*, 775 F.3d 1172, 1180 & n.5 (9th Cir. 2015)) ("This incidental use defense to privacy torts is 'widely recognized' by courts and the Ninth Circuit has 'assumed' it exists under California law in the absence of dispute from the parties.").

[14] *Kolebuck-Utz* grounded its holding only on the commercial value of plaintiffs' name without determining whether the defendant's actions qualified as incidental use. *See Kolebuck-Utz*, 2021 WL 1575219 at *2 ("Plaintiff alleges that Defendant used her name to entice users to purchase Defendant's product. This is sufficient to establish commercial value as a matter of law.") (internal citation omitted).

[15] *See Hudson I*, 702 F. Supp. 3d at 633 (quoting *Knapke*, 553 F. Supp. 3d at 877) ("[R]ather than analyze Ohio's case law on incidental use, the court merely referred to the argument as an 'inappropriate attack to the Complaint based on facts outside the pleadings.'").

*Kolebuck-Utz*, and *Knapke* to reach its conclusion—rather than applying the precedents established by Ohio's courts—*Wilson* overlooks Ohio law's narrower interpretation of incidental use. *See Wilson*, 702 F. Supp. 3d at 628.

Second, Ohio precedent shows that Plaintiffs have failed to show a more-than incidental use of their names. In *Vinci*, the Olympic weight-lifting gold medalist Charles Vinci alleged that the defendants had engaged in a "partnership" to "use his name and likeness on a series of promotional disposable drinking cups sold as Dixie Cups." *Vinci*, 591 N.E.2d at 793. Specifically, the defendants' cups presented "accurate, historical information" about Vinci's accomplishments. *Id.* at 794. The court applied the Restatement's incidental use exception to affirm the trial court's entry of summary judgment against Vinci, reasoning that "the mention of the athletes' names within the context of accurate, historical information was incidental to the promotion of the Dixie Cups . . . The reference to the athletes and their accomplishments was purely informational; there was no implication that [Vinci] used, supported or promoted the product." *Id.*

In *Balsley*, the defendant published a nude photograph of the plaintiff in Hustler Magazine and noted next to the plaintiff's photograph that she was formerly employed as a news anchor until she resigned due to the photograph's publication. 2010 U.S. Dist. LEXIS 152034 at *4. Just as the *Vinci* defendants had only incidentally used Vinci's name by mentioning it "within the context of accurate, historical information" and without implying "that [he] used, supported, or promoted the product," *Vinci*, 591, N.E.2d at 794, the court in *Balsley* held that the defendant's publication of the plaintiff's name, image, and career information was incidental because it "contain[ed] historical information about Plaintiff Balsley" and did "not imply that she uses, supports, or

28

promotes Hustler magazine.  In fact, it is clear that the photograph is part of a contest."  *Id.* at *25-26.

Plaintiffs resist *Balsley*'s holding, writing that it was "[s]ignificant to the court's holding" that Balsley's nude photo "was 'within the magazine and not on the cover'" and that "'the magazine was shrink wrapped.'"  (Doc. No. 13 at PageID # 126) (quoting *Balsley*, 2010 U.S. Dist. LEXIS 152034 at *25).  Those comments are not part of the holding.  The court was summarizing the defendants' three arguments.  The full quote reads:

> Defendants argue that it is significant that the photograph of Plaintiff was within the magazine and not on the cover and that the magazine was shrink-wrapped.  Moreover, Defendants argue that the photograph was published as factual and historical information of Plaintiff's public activities, and Defendants did not use the photograph in a way that would suggest that Plaintiff endorsed or promoted Hustler Magazine.

*Balsley*, 2010 U.S. Dist. LEXIS 152034 at *25.  As noted above, the court based its holding on only the latter two arguments, not on the embeddedness of Balsley's name and image within the publication and its inaccessibility to onlookers.  *See id.*

In *Imperial Aviation Servs. LLC v. Ohio State Univ.*, 2024-Ohio-3200 (Ohio App. 10th Dist. 2024), "the OSU Airport posted information on social media, including Facebook and Instagram, regarding services [plaintiff Imperial Aviation] provided at the OSU Airport[,]" which "included a reference to Imperial Aviation and an image of Muller [its owner] cleaning an airplane."  *Id.* at ¶ 3.  Additionally, a communications specialist for the OSU Airport published two articles detailing how Imperial Aviation sponsored a capstone project for students in OSU's Center for Aviation studies, and how "Muller served as a mentor to the students in the project." *Id.* at ¶ 6.

After approvingly citing to *Zacchini*'s adoption of the Restatement, the court highlighted that Ohio's incidental use exception "means 'one's name and appearance, in and of themselves, are not private, and therefore may be brought before the public." *Id.* at ¶ 28 (quoting *Bosley v. WildWetT.com*, 310 F. Supp. 914, 920 (N.D. Ohio 2004)).  The court stressed that OSU's use of Imperial Aviation's name and image in the social media posts was merely incidental because "no reasonable person could find that the usage of Muller's likeness, as a person cleaning an airplane, on OSU social media posts, was more than incidental to the informational purpose of those posts," because the advertising only identified "Imperial Aviation, and its owner Muller, as one of multiple sponsors of capstone projects[,]" and because "[t]he references to Muller and Imperial Aviation in these articles reasonably only can be considered incidental to the purpose of publishing information about the capstone program." *Id.* at ¶ 30.  While neither party addresses *Imperial Aviation*, the case demonstrates that using a plaintiff's name in promotional material describing their activities can still be incidental even if their activities are the primary draw of the promotional material.

*Harvey* also provides a relevant discussion of "incidental use."  There, the defendant created three slides for a slideshow in an online real-estate continuing education course.  *See Harvey*, 2020-Ohio-1642, ¶ 25.  Each slide aimed to warn real estate agents against committing fraud by detailing how the plaintiff had, in a prior lawsuit, been held liable when she sold her termite-infested home to buyers without disclosing to the buyers the existence of the infestation.  *See id.* at ¶¶ 25-27.  The Court concluded that the defendant had only used the plaintiff's name incidentally because "she was mentioned in only three slides of a 200-page presentation."  *Id.* at ¶ 65.

Plaintiffs cite to *Bob Ross Buick, Inc.*, 2006-Ohio-2638 (Ohio App. 2d Dist. 2006).  The court held that a defendants' forgery of a plaintiff car salesman's signature to solicit his former (and

potentially future) clients went beyond incidental use.  *See id.* at ¶ 19.  But Plaintiffs fail to discuss it beyond citing it for the general proposition that "Ohio common law precludes the commercialization of an individual's name or likeness through the tort of misappropriation."  (Doc. No. 13 at PageID # 116.)  Even if Plaintiffs had discussed *Bob Ross Buick*, it would not help Plaintiffs' position because their claims do not rest on forged signatures used to deceive unwitting customers into associating their names with their property, but on Yardi's authentic reproduction of their already-public ownership interests in real estate.  (Doc. No. 1 at PageID #10, ¶ 45; *Id.* at PageID # 12, ¶ 56.)

As noted above, *Hudson I* canvassed much of the above Ohio caselaw[16] to determine that Ohio employs a relatively "narrow" construction of the right of publicity.  702 F. Supp. 3d at 634. This Court agrees with that analysis.  Even when a defendant uses a plaintiff's name in an advertisement, that use is merely incidental if the defendant mentions the name "within the context of accurate, historical information" and does not imply that plaintiff "uses, supports, or promotes" the product the defendant is advertising.  *See Balsley*, 2010 U.S. Dist. LEXIS 152034 at *25 (quoting *Vinci*, 591 N.E.2d at 794); *Hudson I*, 702 F. Supp. 3d at 634 ("The publication of Plaintiffs' information, with no implication that they use, support, or promote the product, in Defendant's database, which purportedly contains 120 million profiles, appears incidental in a way similar to the use of the plaintiffs' information in *Vinci* and *Harvey* was incidental.").

Here, Plaintiffs' claims fail because PropertyShark's free property reports likewise present accurate, historical information regarding Plaintiffs' legal ownership of real estate, and those property reports do not imply that Plaintiffs endorse PropertyShark.  Instead, Plaintiffs allege only that the

---

[16] *Imperial Aviation* was decided in 2024 after *Harvey I* was decided in 2023.

visitors to PropertyShark "have viewed information on" Plaintiffs, but that information consists of no more than their name and an accurate, historical record of their real estate ownership information. Just as the defendants in *Vinci* placed Vinci's name and achievements on their Dixie Cups to market their product, Yardi places Plaintiffs' name and publicly accessible property information on property reports to "entic[e] users to commit to monthly or yearly subscriptions" to PropertyShark.  (Doc. No. 1 at PageID # 8, ¶ 36).  As alleged, PropertyShark property reports do not imply Plaintiffs' endorsement of PropertyShark, but only mention their names alongside their "address[es], and the purchase date[s], price[s], and property tax details for the propert[ies]."  (*Id.* at PageID # 7, ¶ 36.).

Accordingly, because Plaintiffs' primary argument relies on distinguishable, non-binding and less persuasive cases, and because Plaintiffs have failed to plead that PropertyShark provides any more than accurate, historical information about Plaintiffs that does not imply their endorsement of PropertyShark, the Court finds that the Supreme Court of Ohio would hold that Plaintiffs allege a merely incidental use of their names and have therefore failed to state a claim under the ORPS and Ohio common law.

### D.  Constitutional Avoidance Doctrine

"[T]he constitutional-avoidance doctrine directs federal courts to sidestep constitutional questions whenever 'there is some other ground upon which to dispose of the case.'"  *Elhady v. Unidentified CBP Agents*, 18 F.4th 880, 885 (6th Cir. 2021) (quoting *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984)); *Gary D. v. Comm'r of Soc. Sec.*, 2022 U.S. Dist. LEXIS 131070 at *36 n.6 (S.D. Ohio July 22, 2022) (citing *Torres v. Precision Indus., Inc.*, 938 F.3d 752, 754 (6th Cir. 2019)) ("The constitutional avoidance doctrine instructs federal courts to refrain from rendering constitutional rulings unless absolutely necessary."); *see also Franklin Mem'l Hosp. v. Harvey*, 532

32

F. Supp. 2d 204, 211 (D. Me. 2008) (quoting *Hudson Sav. Bank v. Austin*, 479 F.3d 102, 106 (1st Cir. 2007)) ("[I]f a particular case can be disposed of on some narrower, less contentious ground, a court should avoid making a constitutional judgment.").  "If a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law,[17] the Court will decide only the latter."  *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).

This Court heeds Justice Brandeis's advice.  At this juncture, the Court has already decided the statutory and common law issues raised by Defendant's Motion and it has concluded that neither Ohio statutory nor common law supports Plaintiffs' claims.  Thus, the Court can dismiss the Complaint on that basis alone.  Rather than expand the scope of its judgment by wading into "complex and murky questions of constitutional law [lying] beneath the surface," *Franklin Mem'l Hosp.*, 532 F. Supp. 2d at 211, this Court restricts its analysis to Ohio law so that it decides no more issues of law than necessary.

Accordingly, the Court declines to analyze the First Amendment implications of Plaintiffs' interpretation of the ORPS and Ohio common law.

## V.    Conclusion

For the reasons set forth above, the Court finds that Plaintiffs have failed to allege a commercial value to their names and, instead, have alleged only an incidental use of their names.

---

[17] Because Justice Brandeis was writing before *Erie*, "general law" in that context refers to the "federal general common law" *Erie* replaced with state common law, i.e., here, Ohio's common law tort for invasion of privacy.  *See Sosa v. Alvarez-Manchin*, 542 U.S. 692, 740-41 (2004) (Scalia, J., concurring) (quoting *Erie R.R. Co. v. Tompkins*, 304, U.S. 64, 75 (1938)) ("After canvassing the many problems resulting from 'the broad province accorded to the so-called 'general law' as to which federal courts exercised an independent judgement,' the *Erie* Court extirpated that law with its famous declaration that '[t]here is no federal general common law.'").

Therefore, Plaintiffs have failed to state a claim under the ORPS and Ohio common law upon which relief can be granted, so the Court does not reach Defendant's First Amendment defenses.

Accordingly, the Court GRANTS Defendant's Motion to Dismiss and DISMISSES Plaintiffs' Complaint WITH PREJUDICE.

**IT IS SO ORDERED.**

_s/Pamela A. Barker_
PAMELA A. BARKER
Date:  February 11, 2025            U. S. DISTRICT JUDGE

34